[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The following motions are resolved herein:
Nos. 143 and 168 (Plaintiff's Motion of March 8, 2000, to Modify Child Support and Objection Thereto)
No. 161 (Plaintiff's Motion of June 28, 2000, for Contempt)
No. 166 (Plaintiff's Motion of July 12, 2000, to Modify Custody and Visitation)
No. 172 (Plaintiff's Motion of August 8, 2000, for Attorney's Fees)
No. 186 (Plaintiff's Motion of March 27, 2001, to Terminate Stay)
No. 188 (Defendant's Motion of April 14, 2001, for Increased Visitation)
Lisa Nagy and Stevens C. Sheppard were married on December 22, 1990, and divorced on February 22, 1999. One child — Blake — had been adopted shortly after birth and before the dissolution; born July 26, 1997, Blake is now four (4) years old. At the time of dissolution, the court incorporated by reference into the Judgment a Separation Agreement (hereinafter "Agreement") of the same date and granted the couple joint legal custody of Blake with residential custody to the plaintiff mother and liberal rights of visitation to the defendant father as per an agreed schedule. No alimony was awarded either party. Child support in the amount of $150 per week was ordered; that amount was found to be in accord with the Guidelines and has regularly been paid.
Both parents are in good health; the plaintiff is forty (40) years old and the defendant is forty-three (43) years old. Though gainfully employed as a graphic designer and a computer marketing representative at the time of dissolution, the plaintiff has not worked outside the home since approximately October of 1999. She has been working on a book at home for the past one and one-half (1 1/2) years. The defendant is an investment manager who currently works in New Jersey and commutes there several days a week, working from home the remaining days. The plaintiff resides in the marital home awarded her at dissolution. That home had been owned by the defendant for approximately eight years when they married. At trial, an appraiser testified his estimate of value at $586,000 was conservative because he was not permitted to see the inside of the house. The court finds the value of that asset to be $586,000. Neither party has remarried. Each comes from a family of means and each CT Page 11736 has received financial assistance in one form or another since the dissolution.
Each was represented by experienced counsel both at the time of dissolution and currently. Since the dissolution, there has been ongoing litigation concerning child support, custody, and visitation. Consistently, this couple has turned to the court to resolve their issues — many of which find their basis in money and, unfortunately, their counsel have encouraged the same by eschewing courtesy, communication, and negotiation and inundating the court with a myriad of motions (many with lengthy objections and memoranda) — most of which are duplicative and add little new information. Discovery has been unnecessarily protracted as a result of counsel's unwillingness to extend to each other the professional courtesy of compliance and cooperation which, had it been extended, may have resulted in resolution of some of the pending motions without the need for testimony. In the absence of the same, the result has been the escalation of attorney fees (which the plaintiff now seeks from the defendant) and a ratcheting of bitterness between the parties and counsel.
Blake is a child of special needs, of which both parties were well aware at the time of the dissolution. He has food allergies of serious dimensions. At or about six (6) months of age, he went into anaphylactic shock from having consumed a lactaid product to which he was allergic and he required hospitalization. To this date, he continues to require an amino acid based formula called Neocate (and/or Neocate One+) necessary to his nourishment. He has some sensory issues and some alleged physical problems — particularly with the right leg. A medical provider has stated the child is somewhere along the continuum of autism spectrum disorder.[1] It cannot be controverted that both parents love Blake nor can it be any more clear each responds differently to the child's needs. The plaintiff has literally devoted herself, particularly since her outside employment ended, to preparing Blake for each new experience through a visualization vehicle known as "storyboarding",[2] educating herself on the subject of autism, and advocating on that issue. She is an intelligent, articulate woman who demonstrates extraordinary patience and perseverance with the child. That same patience and understanding does not extend to acceptance of her former husband's parenting style — perhaps because of her deeply held belief Blake requires constant care and vigilant supervision and thus that he cannot participate in many of the common childhood activities and play experiences without someone one step behind or to his side. Despite Blake's present daily attendance at school from 8:30 a.m. to 2:30 p.m. in a cooperative education program for special needs children (for which the town of Fairfield pays) and despite the plaintiff's presence at home each day,[3] she has in the past employed — and wishes to employ again — a person variously CT Page 11737 described as a "companion", "aide", or "shadow" who is present in the home after school hours to reinforce learning, supervise play, and ensure the child's safety (She has testified the child's right leg gives out if he runs and he is caused to collapse, that Blake cannot mount steps, that he "spins", has temper tantrums — all as a usual behavioral pattern; the defendant disagrees.). She has concluded the cost of Neocate and of the "aide" (together with a host of other expenses) are "medical" costs for which she has billed the defendant and for which he has refused to pay. Each relies on the Agreement in support of his/her position.
The defendant, while laudatory of the plaintiff's parenting skills, does not accept that Blake is autistic nor does he accept the plaintiff's claims regarding the extent of Blake's physical or sensory limitations. He and his sister both testified Blake plays normally with children his own age and that, when with his father, the child climbs, steps, walks — even runs — with few or no difficulties. The defendant testified he takes Blake to public places such as stores and libraries without resultant harm to or confusion for the child. The father's caretaking style is less "hands on" than is that of the plaintiff (or the aide) in the sense he does not prepare Blake for each activity, is not committed to storyboarding, and prefers to permit the child to experience activities as they occur though he is faithful to Blake's special food needs and mindful Blake may require more supervision than other four year olds require. The plaintiff is critical of the defendant's parenting style, believing the dad places Blake at risk for injury though she can point to no specific instance wherein harm has in fact occurred to Blake because the defendant was not attentive to his care. The differing parenting styles does not mean one parent loves Blake more or is a better parent. It may well be beneficial to the child to have the freedom to experience in the less structured environment his father provides since it may afford Blake the opportunity to more fully develop his skills and talents and the plaintiff might consider that possibility. Mindful, however, that these contrasting caretaking styles may create confusion for Blake as he grows older (or, worse, cause him to rebel against the structured environment of the plaintiff's home), the court recognizes the value of a consulting medical provider to whom the parents may submit childrearing issues which will persist so long as this couple refuses to replace their personal antagonisms with the recognition each loves Blake and is committed to accepting whatever personal consequences — whether emotional, social or financial — are dictated by Blake's medical and personal needs.
On April 20, 2000, the matter of the defendant's visitation was referred to the Family Services Office for mediation; that resulted in a May, 2000, agreement to abide by the visitation ordered by Cutsumpas, J., on the date of dissolution. In response to a later motion by the CT Page 11738 plaintiff for sole legal custody and diminished visitation by the defendant, the matter was again referred — this time for evaluation. Counsel for Blake was appointed as guardian ad litem. In a report dated January 24, 2001, and updated June 20, 2001, it was recommended the parents retain joint legal custody and that the father have alternate weekend visitation from Friday at 5:00 p.m. through Sunday at 5:00 p.m. and that there be additional visitation on the Tuesdays following the mom's weekend with Blake. On the father's Tuesday visitation, the recommendation was that he pick Blake up at school and return him home at 7:00 p.m.; in the event that arrangement created ongoing observable difficulties for Blake, the father would pick up the child at his home at 3:30 p.m. and return Blake to home at 7:00 p.m. At the conclusion of the instant trial, the parents agreed to that custody and visitation recommendation being made an Order of this court.
The Agreement incorporated in the Judgment of February 22, 1999, is central to this court's determination particularly with regard to unreimbursed/uninsured medical expenses for which the defendant is one-half (1/2) liable. That agreement is replete with references to the then state of Blake's health and his special needs (See e.g., 6.1(i), (ii), and (vii) and the entirety of Article VII.). Clearly, both parents and their counsel knew of the reality of the child's unique needs and that they would have ongoing medical expenses;[4] they knew, too, of the need to assign the fiscal responsibility for providing for those needs. Specifically, Article 7.2 addresses unreimbursed expenses and provides:
 The parties shall equally share any unreimbursed or uninsured costs incurred for the benefit of the child, for all reasonably necessary medical, optical, surgical, or hospital care, treatment which shall include any occupational therapist, allergist, nutritionist or physical therapist and the cost of prescriptive drugs ("Medical Expenses") and dental and orthodontia expenses until such time as the child attains age eighteen (18); provided, however, that no psychiatric or psychological or orthodontia or occupational therapist, allergist, nutritionist or physical therapist expenses or elective surgery or treatment shall be incurred without the prior mutual consent of the parties, which consent shall not be unreasonable (sic) withheld. Provided the Husband receive a copy of each bill and statement of insurance, the Husband will reimburse the Wife within 30 days of receipt of such medical expenses for the minor child.
Under the June 3, 1971, will of the defendant's mother, Jane S. CT Page 11739 Sheppard (Plaintiff's Exhibit E), three (3) trusts were established for her three (3) children, one of which was this defendant. The executors of her will and the trustees of each of the testamentary trusts were her husband and the defendant's father, W. Stevens Sheppard, and James F. Henry.[5] The trusts were funded immediately upon the death of Jane S. Sheppard in January of 1975.
The Jane S. Sheppard Trust was a client of the investment firm of which the defendant and his father were each fifty percent (50%) owners. The uncontroverted evidence was that there had been no distribution of accumulated income in the trust fund from Jane Sheppard's death until March 11, 1999, at which time the defendant's interest (after appropriate taxes had been deducted) was $143,047 (Defendant's Exhibit 20). Those monies were used by the defendant to finance a home at 157 Old Dyke Road in Trumbull, Connecticut. The Agreement to purchase that house (Plaintiff's Exhibit DD) was signed by the defendant's father on December 29, 1998. The defendant testified his father thereafter assigned the father's interest in the property to his son (the defendant) and, by warranty deed of March 11, 1999 (Plaintiff's Exhibit R), the defendant took title. Two (2) other distributions were made to the defendant by the trust prior to the instant trial — one on December 16, 1999, for $3,000 (Defendant's Exhibit 22), and the other on February 7, 2000, for $4,000 (Defendant's Exhibit 21). W. Stevens Sheppard testified the defendant had no control over the trust; in fact, Plaintiff's Exhibit E gave to the named trustees the power to distribute net income as those trustees "shall, in their discretion determine, to such child" (Page 3 of said exhibit.). He also testified all income "through 1999" had been distributed. The plaintiff claims the defendant's financial affidavit of February 9, 1999, was false in that it did not accurately reflect his "income" at the time and she further claims the actions of the defendant in keeping secret from her both his intended purchase of the house and the distribution of $143,047 from the trust and/or his failure to list on his financial affidavit the precise amount of the distribution constituted a fraud. She has moved to modify the defendant's child support obligation based upon what she claims is a significant change of circumstances both with regard to Blake's medical condition and the defendant's income.
Testimony was taken over nine (9) days and ended on July 11, 2001. Numerous witnesses testified. A total of eighty-two (82) exhibits were offered. Various memoranda were submitted by the parties. The court has observed the demeanor of the witnesses and evaluated their credibility, has examined the exhibits, carefully read the memoranda, and researched the applicable law. The following findings are made.
DOCKET NOS. 143 AND 168 (PLAINTIFF'S MOTION TO MODIFY CHILD CT Page 11740 SUPPORT POST JUDGMENT AND OBJECTION THERETO)
The trust distribution of $143,047 was made subsequent to the dissolution and, thus, there is no claim the defendant understated his "income" on the affidavit of February 9, 1999. In fact, plaintiff was aware — prior to the dissolution — of the fact defendant would receive an inheritance from his mother's trust at some future date. That affidavit (13 days prior to the Agreement and Judgment) contained the disclosure — on page 4 — of an asset consisting of "a one-third interest from a Trust" established under his mother's will. It inaccurately stated he would receive that interest at the time of his father's date (W. Stevens Copeland) and that, since his father was then sixty-eight (68) and in good health, the value of that interest could not then be determined — particularly since eighty percent (80%) of the trust was invested in stock and subject to market fluctuations. Query whether that representation was deliberate — and therefore fraudulent — or a simple misunderstanding of the terms of his mother's will. There was no evidence adduced during discovery or at trial that the defendant was personally familiar with the terms of the will or that he knew his interest vested at his mother's death and that either or both trustees could distribute net income to him at their discretion. The defendant disclosed his interest in the trust in response to interrogatories pendente lite. Relevant to this claim is Article XVI of the Agreement, under the terms of which each party waived his/her right, claim, and interest by way of alimony and/or property distribution to any inheritance received or to be received in the future by the other party." The distribution from the trust is the defendant's inheritance. It is not "income" as that term is defined by the Guidelines but a gift to be made at the discretion of the trustees. Trust interests constitute property subject to distribution in a dissolution action.Bornemann v. Bornemann, 245 Conn. 508, 519 (1998). The award of his/her inheritance to each party at the time of dissolution constitutes a property assignment which the court is without statutory authority to modify. See e.g., Bartlett v. Bartlett, 220 Conn. 372, 382 (1991). Here, however, the plaintiff does not seek a portion of that inheritance be assigned to her but asks instead that the child support order be increased because the defendant's financial circumstances had substantially changed since the dissolution due to that inheritance and a substantial increase in wealth of any sort may form an appropriate ground for modification.
Assuming arguendo the Judgment's award of the defendant's assignment of his inheritance to him free of any claim by the plaintiff does not constitute an assignment of property so as to deprive the court of continuing jurisdiction or the ability to modify and assuming that CT Page 11741 Connecticut law were to apply to this will executed in New York by a New York resident (The will is silent as to what law applies.), one Connecticut case is helpful to the analysis. In Schorsch v. Schorsch,53 Conn. App. 378 (1999), this state's appellate court determined the principal payments the defendant received pursuant to a purchase money mortgage he took back when he sold property was in exchange for an asset already distributed to him as part of a property distribution and could not be included in the calculation of his income. Id. at 386. "The mere exchange of an asset awarded as property in a dissolution decree, for cash, the liquid form of the asset, does not transform the property into income." Id., at 385 (citation omitted). That is underscored when, as here, the distributions under the trust were irregular in their amounts and in the timing of their occurrence and beyond the defendant's ability to control.[6]
The court cannot conclude the defendant's representations in responses to discovery or on his financial affidavit constituted fraud. The essential elements of an action in common law fraud are that: (1) a false representation was made as a statement of fact; (2)it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury. Billington v. Billington,220 Conn. 212, 217 (1991). The party asserting such a cause of action must prove the existence of the first three of these elements by a standard higher than the usual fair preponderance of the evidence, which higher standard has been described as "clear and satisfactory" or "clear, precise and unequivocal." Repo v. Connecticut Ins. PlacementFacility, 219 Conn. 339, 343 (1991). While the defendant's trial testimony regarding the machinations between himself and his father surrounding the purchase of the house in Trumbull was not credible, the plaintiff has not met her burden of proof the defendant knew the referenced representations on his affidavit of February 9, 1999, and his response to interrogatories were not true when he made them and that he made them to induce the plaintiff to rely upon them in the absence of any evidence of his familiarity with the terms of the trust or that he personally administered the trust and should therefore have known a distribution to him could be made by his father at any time. Nor does it constitute fraud on the court since, in the marital context, the concept of fraud is confined to situations where both parties join to conceal material information from the court. Billington, supra, at 224-25.
Nor does this court find credible the testimony of the plaintiff's CPA who based his conclusions on present interest rates (which he could guarantee only for that day) when that witness was not licensed in this state as an investment adviser and considered only one financial affidavit and two years' tax returns. CT Page 11742
The plaintiff's modification motion based on Blake's alleged substantial change in circumstances must also fail in the absence of any medical evidence Blake now suffers from conditions different in kind or extent than they existed at dissolution or could then have been anticipated given the parties' knowledge of his symptomatology.
The child support is, however, modified based upon the defendant's new employment to $250 per week in accordance with the Guidelines (Defendant's Exhibit 40).
DOCKET NO. 161 (MOTION FOR CONTEMPT POST JUDGMENT)
The plaintiff has moved the defendant be held in contempt for his failure to pay the unreimbursed and uninsured costs of Blake's medical expenses. Under Section 7.2 of the Agreement (as above quoted), the defendant is responsible for one-half (1/2) of such "medical expenses" as are therein listed. The plaintiff submitted such charges to the defendant under date of February 14, 2000, February 24, 2000, and June 15, 2000; they remain unpaid. They cover a wide variety of entries to include but not limited to charges for Karen Kranyik (and others who were employed as companions" or "aides"), a food allergist, books and magazine subscriptions (for medical information), drug prescriptions (i.e., zyrtec, prilosec, zithromax, etc.), medical items (i.e., epipens) photo processing expenses (for visual cards used in storyboarding), a leg brace, doctor visits or medical examinations or medical radiographic testing, photofilms, child care costs, security consultants, educational games and toys and CDs, weighted blankets, UPS, binders (notebooks), furniture (i.e., preschool chair and tray), boardmakers, orthotics, occupational therapy, dental costs, recreational/play equipment (i.e., swing set), bath mat and splash guard, humidifier, and clothing items (i.e., pajamas).
The defendant posits: (1) none of the above are "medical" expenses; (2) certain items — i.e., Neocate and/or Neocate 1+ — are not "prescription" items; and/or (3) there was not prior mutual consent to the incurring of the treatment or service.
Some items are clearly medical expenses not included in any category requiring mutual consent. There can be no legitimate reason for not paying charges incurred for doctor visits, examinations, consultations, radiographic testing, a leg brace or other orthotic, prescription drugs or items ordered by a medical provider (i.e., epipens), etc. The defendant is liable for one-half (1/2) of all such unreimbursed/uninsured costs incurred after February 22, 1999. Such costs also include co-pays, which amounts are uninsured" costs incurred for "reasonably necessary CT Page 11743 medical expenses." The defendant has wilfully refused to pay these charges and is found in contempt of orders to do so.
Some items are clearly non-medical — i.e., aides/shadows (by whatever name they may be called[7]), security consultants, recreational equipment, photo charges, games and toys and videos, bathing aids, books and magazines and subscription costs for same,[8] UPS, "child care" costs, weighted blankets, binders, children's furniture, boardmakers, humidifier, clothing items. For these costs, the defendant is not liable.
The single largest expense is that of Neocate (or Neocate 1+); presently, the plaintiff spends $144.50 per week for this item. The defendant's position is that he is not liable for this expense because it is not a "prescriptive drug." The court finds it is not a prescriptive drug but it is a reasonably necessary medical expense. Blake suffers from potentially fatal food allergies which have, on at least one (1) occasion, produced anaphylactic shock requiring hospitalization. Neocate is an amino acid based formula essential to Blake's growth, sustenance, development, and well-being. It is no less a "reasonably necessary medical expense" than is any other prescriptive drug prescribed for his care and treatment. Analogously, nicotine patches are no less reasonably necessary medical expenses when they are purchased over the counter than when a medical provider writes a prescription for them; niacin or aspirin are no less reasonably necessary medical expenses" when purchased over the counter to address blood pressure and heart conditions than are other prescriptive drugs ordered by medical providers for persons with those medical ailments. The defendant is cognizant of the child's need for Neocate; he purchases Neocate when he exercises visitation with Blake. The defendant's narrow construction of the term "medical expenses" is antithetical to the established concept that the practice of medicine is an expansive one. Decisional law holds that, to the extent expenditures are made in connection with "the diagnosis, cure, mitigation, or prevention of disease or for the purpose of affecting any structure or function of the body or mind", they are medical expenses. Bucy v. Bucy,23 Conn. App. 98, 102 (1990). Thus, psychotherapy expenses for the treatment of Tourette's Disease have been found to be medical expenses because it is a necessary part of a ten year old's overall treatment plan. Santos v. Santos, docket no. 057412, Waterbury Superior Court (DeMayo, J.), November 13, 1986. Expenses for an eye examination and eye glasses have been found to be "medical expenses." Feroleto v. Feroleto, docket no. FA89 077467S, 1999 Ct. Sup. 14216 (October 19, 1999). So, too, are such expenses as are incurred for an occupational therapist, speech pathologist, nutritionist, and food allergist. The defendant is liable for one-half of all such unreimbursed/uninsured costs — to include co-pays where appropriate. CT Page 11744
The defendant has wilfully not paid these expenses when required to do so by the decree.[9] He is found in contempt for not having done so.
The court further finds the plaintiff was not required to obtain the defendant's prior consent before incurring the elective" expense of an occupational therapist (Care and treatment provided by a food allergist is hardly "elective" in view of Blake's special needs.). Under 7.2 of the Agreement, the defendant could not unreasonably withhold his consent. His failure to pay his portion of these unreimbursed/uninsured costs was unreasonable; to impose upon the plaintiff the burden of securing his consent to incur such expenses as are reasonably medically necessary for Blake's care and treatment is antagonistic to Blake's well-being and is potentially fatal.
Docket Nos. 166 and 188 (Plaintiff's Motion to Modify Custody and Visitation; Defendant's Motion for Increased Visitation)
The parties have agreed to accept the recommendations of the Family Relations Office and the appropriate Order follows.
Docket No. 172 (Plaintiff's Motion for Attorney Fees)
The request is that the defendant pay the plaintiff's attorney fees for the defendant's failure to pay one-half (1/2) of the unreimbursed/uninsured medical expenses in violation of a prior court Order and for the delay and inconvenience she claims were caused by the defendant throughout the discovery process and in getting the matter to trial. Specifically, she points to a two-day deposition having been taken of her when, she states, many of the same inquiries (though clearly notall of the documentation requested) were made of her prior to the dissolution (The defendant has been represented by the same counsel throughout.), the multiplicity of pleadings filed, the requests for continuance, the off-marking of short calendar motions, etc. The court finds many of the pleadings were in fact duplicative and that much of the discovery was unnecessarily protracted.
It cannot, however, be said the entire fault for delays and/or extended discovery lies with defense counsel. When, for example, the plaintiff was required to bring with her to a deposition documentation of expenses incurred since the dissolution and to organize and collate those records so that the inquiry could be more efficient, the plaintiff's response was to bring with her a box into which she had "thrown slips of paper" reflecting costs incurred; the response was completely unorganized — i.e., in terms of provider identity, time period, etc. She CT Page 11745 explained at trial that that was the way "I file things." Surely, that was to prolong the deposition and the information gathering process. When, at the same deposition, her counsel frequently interrupted the questioning by counsel for other than substantive reasons and when he directed his client not to answer questions for inappropriate reasons, the plaintiff can hardly complain it was solely defense counsel whose actions resulted in her incurring additional attorney fees.
Her counsel has submitted an affidavit for services and costs in the total amount of $53,079.71 and asks a credit of $600 be applied — for a balance of $52,479.71. of that amount, attorney fees are $34,560 (The fees for her dad — an established practitioner with a private practice — begin April 3, 2000, and end November 16, 2000 and are included in that amount; no retainer agreement or affidavit for his services to accomplish research, organize discovery material, etc., is submitted by that counsel. The bill for the services of Attorney Kanowitz is for the period August 31, 1999 — March 20, 2001, only.).
In determining whether to award counsel fees, the trial court must consider the total financial resources of the parties in light of the statutory criteria of Connecticut General Statutes § 46b-62 and § 46b-82. Miller v. Miller, 16 Conn. App. 412, 418 (1988). Those criteria are to be applied in light of other established principles — specifically, where both parties are financially able to pay their own expenses, they should do so and, where because of other orders, the potential obligee has ample liquid funds, an allowance of counsel fees is not justified. Id. (Citations omitted.) The decision to award counsel fees in a dissolution case is clearly a matter within the trial court's discretion. Holley v. Holley, 194 Conn. 25, 33-34 (1984).
The plaintiff has the ability to work inside or outside the home. She has the capacity — by her own testimony — to earn $120,000 — $130,000 per year (That amount was earned working primarily out of her home in the past.). She has testified she is presently working on a book and expects in the future to make as much as she did in 1999 (Plaintiff's Exhibit A — her 1999 federal tax return showed adjusted gross income in that year to be $29,681.). She has a demonstrated earning capacity significantly greater than that of the defendant. Her financial affidavit on the date of dissolution (Defendant's Exhibit 34) showed assets of $561,450.73; her financial affidavit of December 4, 2000 — the most recent in time — showed assets of $753,444 (which this court finds to be undervalued in view of the finding the marital home — to which she has sole title as a result of the property distribution made in the Judgment of Dissolution — is conservatively valued at $580,000). His financial affidavit of February 9, 1999, showed assets of $680,047.90; his CT Page 11746 financial affidavit of December 4, 2000, showed assets of $796,644.85. Her assets on the same date were greater than were his when the true market value of the home is considered. That she has available to her liquid assets is clear in view of her financial affidavits showing payment of fees to her counsel in the amount of $750 a week.
No award of attorney fees beyond those awarded with regard to the finding the defendant is in contempt (which award of fees is in accord with paragraph 9.3 of the Agreement) is appropriate.
Docket No. 186 (Plaintiff's Motion to Terminate Stay)
The court finds any appeal of the Orders here made will be taken only for delay — as has frequently characterized the defendant's course of conduct throughout these proceedings — and that the due administration of justice requires the termination of any stay of execution, automatic or otherwise, as may be applicable to such Orders.
Motion number 186 is granted and the stay is terminated pursuant to Section 61-11(c) of the Connecticut Practice Book.
The following Orders shall enter:
 5. The defendant shall pay child support in the amount of $250 per week in accord with the Child Support Guidelines. The same shall be paid $1,000 monthly in advance of the month — $1,250 monthly in those months in which five (5) weeks begin as per the calendar. That amount shall be paid until the first occurring of Blake's nineteenth (19th) birthday or his graduation from high school.
 6. The defendant is ordered to pay one-half of all unreimbursed and uninsured medical expenses incurred from the date of dissolution until the first occurring of Blake's nineteenth (19th) birthday or graduation from high school. Specifically, such expenses shall include all co-pays incurred as a result of the child's care or treatment, Neocate and/or Neocate 1+, all medical providers or providers of service in connection with the diagnosis, cure, mitigation, or prevention of disease or for the purpose of affecting any structure or function of the body or mind. They include but are not limited to such expenses as are listed on page 19 of this memorandum of decision. The plaintiff need not seek the defendant's consent for CT Page 11747 such treatment so long as that treatment meets the above definition of "medical expense" and is recommended in writing by a treating provider. Such written recommendation shall pre-date the occurrence of the expense and shall be provided the defendant when the plaintiff provides the defendant an invoice for such care or treatment. That invoice shall be provided the defendant within fifteen (15) days of the plaintiff's receipt of the bill and shall be paid by the defendant within fifteen (15) days of notice to him.
 The plaintiff shall immediately arrange for the defendant's name to be placed next after her own on the list of persons to be notified in the event of any medical or school emergency and shall include the defendant's home and work address and telephone number (to be provided the plaintiff forthwith). She shall personally notify the defendant of any medical emergency requiring Blake's hospitalization for any duration within one (1) hour of Blake's admission.
 7. As a sanction for the finding of contempt for his wilful failure to pay one-half (1/2) of Blake's unreimburse and/or uninsured medical costs, the defendant shall:
 (a) honor within thirty (30) days of presentment by the plaintiff a listing of all medical expenses incurred from the date of dissolution to the present, the date of service, the total of each such (separate) cost incurred, the identity of the provider, and the amount of the defendant's financial contribution to the same. Such listing shall be prepared and provided the defendant within forty-five (45) days of this date and shall be accompanied by written verification to consist of invoices for each such expense from providers or a listing prepared by each provider of all such expenses incurred during the relevant time period (as should all future requests for payment be accompanied by such documentation). This notice provision is to be strictly construed as against the plaintiff such that the failure to fully comply shall result in the plaintiff's forfeiture of such reimbursement; and
 (b) pay within thirty (30) days of this date to Edward CT Page 11748 Kanowitz, Esq., seven thousand five hundred dollars ($7,500) toward the plaintiff's counsel fees.
 4. The parties shall continue to share joint legal custody with physical custody to the plaintiff and reasonable, liberal, and flexible rights of visitation to the defendant. Such visitation shall minimally provide:
 (a) alternate weekends (to begin the weekend of August 31, 2001) beginning Friday at 5:00 p.m. through Sunday at 5:00 p.m.;
 (b) alternate Tuesdays (on the Tuesday following the plaintiff's weekend with Blake) when the defendant shall pick Blake up from school and return him home at 7:00 p.m. (The plaintiff shall immediately notify the school of such arrangement.). Should this arrangement create ongoing observable difficulties for Blake, the defendant shall pick Blake up at his home at 3:30 p.m. and return the child to his home at 7:00 p.m.,
 (c) three (3) days during the Christmas school vacation (two overnights) to be agreed upon by the parties not later than October 15 of each year;
 (d) either the winter (February) or spring school vacation each year on an alternating basis (The plaintiff shall have the winter vacation in 2002 and the defendant shall have the spring vacation of 2002 — each such vacation to consist of eight days and seven overnights; in 2003, the vacations shall alternate.); and
 (e) a third week (eight days and seven overnights) during Blake's summer vacation, that week to be agreed upon by the parties no later than May 1 of each such year; and
 (f) such other time (i.e., holidays and birthdays) as are provided in the Agreement of February 19, 1999.
 The parties shall consult with Jeffrey vonKohorn, Ph.D., 7 Whitney Extension, Westport, CT (203-226-4000) with regard to any issue related to CT Page 11749 custody and/or visitation about which the couple cannot come to an agreement after there has been an honest effort to agree. Such "consultation" shall consist of office appointments with the provider on dates and times agreeable to the parties and attended only by the parties and the provider. Such provider shall resolve each such dispute by way of written recommendation to the parties and shall be of such specificity as to resolve the dispute. The recommendation shall be immediately effective. The parties shall be bound by such recommendation and each shall be one-half responsible for whatever costs of such consultation as are not covered by the child's health coverage.
 All other provisions of the Agreement of February 19, 1999, not in conflict with these Orders remain in effect and binding upon the parties.
 Make-up time shall be afforded the defendant in the event only of illness or work-related circumstances which result in his unavailability and in no event to consist of more than five (5) such dates per calendar year.
The court notes the defendant's agreement to be responsible for fifty percent (50%) of Blake's "educational" expenses for so long as he has a child support obligation. The court declines to order the same as being outside the scope of the motions presented for determination but encourages the parties — perhaps with the aid of Dr. vonKohorn — to arrive at an agreed definition of that term and to present an executed stipulation to be made an order of a succeeding court.
SO ORDERED.
SHEEDY, J.